

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7831 | **DATE** | 1/16/2003 |
| **CASE TITLE** | Apelbaum vs. Northeast Illinois Regional Commuter Railroad Corp. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    Enter Memorandum Opinion and Order. Defendant's motion for summary judgment as to Counts I, II, III and IV [60-1] is granted. Counts V. VI and VII are dismissed without prejudice to file in state court. Pretrial conference of 1/17/03 and trial of 1/27/03 are stricken. This case is terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | 3 | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| X | Notices mailed by judge's staff. | | | JAN 2 1 2003 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | 109 |
| X | Mail AO 450 form. Mailed by MD. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 1/16/2003 | |
| MD | courtroom deputy's initials | | | date mailed notice | MD |
| | | | Date/time received in central Clerk's Office | | mailing deputy initials |

JAN 2 1 2003

03 JAN 17 PM 2: 43

U.S. DISTRICT COURT CLERK

**DOCKETED**

JAN 2 1 2003

| | |
|---|---|
| JACOB APELBAUM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| NORTHEAST ILLINOIS REGIONAL | ) |
| COMMUTER RAILROAD CORP. | ) |
| a/k/a METRA/METROPOLITAN RAIL | ) |
| | ) |
| Defendant. | ) |

No. 00 C 7831
Judge Joan H. Lefkow

## MEMORANDUM OPINION AND ORDER

Plaintiff Jacob Apelbaum ("Apelbaum") alleges that defendant Northeast Illinois Railroad

Corporation a/k/a Metra ("Metra") is liable for national origin discrimination (Count I), religious

discrimination (Count II) and retaliation (Count III) under Title VII of the Civil Rights Act of

1964, 42 U.S.C. §§ 2000e *et seq.*  Further, although not alleged under separate counts, Apelbaum

claims national origin and religious discrimination based on a hostile work environment in

violation of Title VII (Counts I and II); a claim under 42 U.S.C. § 1983 (Count IV) for

deprivation of his constitutional right to equal protection of the laws guaranteed by the

Fourteenth Amendment; claims under Illinois law relating to his termination from employment

(Counts V and VI); and a claim for conversion of personal property under Illinois law (Count

VII).  Before the court is Metra's motion for summary judgment on the seven-count Second

Amended Complaint.  Jurisdiction is proper pursuant to 42 U.S.C. § 2000e-5(f)(5), 28 U.S.C. §§

1343(a)(4) and 1367.  For the reasons set forth below, the motion is granted.

1

109

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO THE PLAINTIFF

Apelbaum was born in Poland but moved to Israel when he was young and became a naturalized citizen there. He is of the Jewish faith. In the late 1980s, Apelbaum moved to the United States. Prior to March 27, 1996, Apelbaum was employed by Engineer's International, a company that worked at the Ogilvie Transportation Center ("OTC Project") in downtown Chicago. Initially, he monitored the construction work done by the various contractors on that

project. (Apelbaum Dep. at 481.)

Metra is a public corporation created under the Regional Transportation Authority Act, 70 ILCS 36.15/1.01 *et seq.*, to operate passenger trains in northeast Illinois. During the 1990s, it partially funded and managed the OTC Project. At some unspecified point, Apelbaum met Tim Rhoades ("Rhoades"), who was Metra's Assistant Department Head of Operation Project Performance in the General Development Department (the "Grant Department"). One of the Grant Department's main responsibilities was to assure that the various funding agencies' policies and procedures are followed in the receipt and management of grant funds.

Rhoades noticed that Apelbaum used a software program that Apelbaum called "Construction Manager." Rhoades wanted to hire Apelbaum to develop a derivative product of this software for Metra's use. (Apelbaum Dep. at 483-84, 521; Rhoades Dep. at 32.) On March 27, 1996, Metra posted a Program Manager III position and Apelbaum applied for it. (Def. L.R. 56.1 ¶ 21.) Apelbaum was hired and began working in June 1996. (Def. L.R. 56.1 ¶ 26.)[1] In April 1997, Rhoades discovered that Apelbaum was not progressing on the software development project. (Def. L.R. 56.1 ¶ 40.) Rhoades had Apelbaum stop such programming work and assigned him to concentrate on financial status reports. (Def. L.R. 56.1 ¶ 41.) Rhoades then had the computer equipment that Apelbaum used for the programming work confiscated and moved to what Metra believed was a secure storage area. (Def. L.R. 56.1 ¶ 43; Wojtkiewicz

---

[1]Notwithstanding the facts set forth in this paragraph, Apelbaum repeatedly attests that he had a "contract" with Metra regarding a market and licensing agreement with respect to the Construction Manager program that was not part of his general employment relationship with Metra. (Apelbaum Aff. ¶¶ 19, 20.) Metra disputes this fact by showing that any contracts had to be approved by the Commuter Rail Board. (Def. L.R. 56.1 ¶¶ 35-39.) The court cannot discern from Apelbaum's attestations whether he is asserting that he had contract to enter into a marketing and licensing agreement or that he actually had a marketing and licensing agreement with Metra. Regardless, Apelbaum does not show how these facts are relevant to the court's analysis of Apelbaum's claims nor does the court find these facts relevant.

Dep. at 37, 71.) Eventually, Metra returned some of the computer equipment to Apelbaum. Apelbaum, however, noticed that the computer equipment, which included memory chips and a hard drive, had been vandalized.

## A. Apelbaum's complaints at Metra

On October 18, 1999, Apelbaum filed an internal EEO complaint with Metra. (Def. L.R. 56.1 ¶ 71.) In his internal EEO complaint, Apelbaum alleged that his work had been attacked and destroyed and his computer equipment vandalized. He also alleged that he received a voice mail in which the caller stated, "Hey you fuckin' Jew, do you want to die?"

### 1. the destroyed computer work and vandalized computer equipment

Upon receiving Apelbaum's complaint, Metra police conducted an investigation in which it was determined that the computer equipment had been vandalized while it was in storage, but it is unclear whether Metra identified who was responsible. (Def. L.R. 56.1 ¶ 49.) Apelbaum now asserts that some of the confiscated software and computer equipment were his property. Metra personnel, however, who removed the computer equipment believed that it was Metra's property although some of the computer equipment did not have Metra's identification labels on it. (Wojtkiewicz Dep. at 15, 18-21.) According to Metra, Apelbaum never told the Metra employees that any of the software or equipment belonged to him. (*Id.* at 18-19; Rhoades Dep. at 135.) Apelbaum disputes this fact but attests only that his supervisors were aware that he assembled the equipment and made repairs at his own expense, thus not refuting that he did not tell Metra that the property belonged to him or otherwise stating their source of knowledge. (Apelbaum Aff. ¶¶ 34-35.)

## 2. *the voice mail*

Although Apelbaum testified that he did not know when he received the voice mail, he had earlier responded to Metra's interrogatories that he received it on or about November 25, 1998. (Apelbaum Dep. at 346-47.) Apelbaum played the voice mail to a fellow Metra employee, Jack Groner ("Groner"). (Def. L.R. 56.1 ¶ 86.) Groner told Apelbaum he should report the voice mail to the Metra police, but Apelbaum did not do so until he filed the EEO complaint in October 1999. (Def. L.R. 56.1 ¶ 87.)

Apelbaum contended that the caller was a particular Information Systems ("IS") department employee. (Def. L.R. 56.1 ¶ 90.) After receiving the report, Metra employed a private firm to conduct a voice analysis of that employee and compared it to the voice in the voice mail. (Def. L.R. 56.1 ¶ 92.) The voice analyst reported to Metra that the voice mail did not match the voice of the accused IS department employee. (Def. L.R. 56.1 ¶ 93.) Further, Metra believed the voice mail had actually been left on Apelbaum's phone on September 30, 1996. (Def. L.R. 56.1 ¶ 94; Def. Reply Ex. A, Proper Dep.) Apelbaum could not explain the delay between the voice mail being left on his phone and his not "finding" it two years later until November 25, 1998 other than that he possibly did not check his voice mail. (Def. L.R. 56.1 ¶ 95.)

## 3. *other harassment*

Apelbaum also claims that Metra employees subjected him to other conduct he considered to be harassment including:

- Apelbaum received a birthday card referring to him as "Yassir, Fidel, Moamar and Sadam." (Pl. L.R. 56.1 ¶ 7, Ex. 2.) Apelbaum attaches a copy of a birthday card with cartoonish cats holding up a large cake with

the words "Happy Birthday." One of the written comments in the card is "Yassir Happy Birthday Fidel Moamar Sadam[.]" Apelbaum, however, does not proffer when he received it, whom he believes wrote the comment, and whether he complained about this card to his supervisors or to the Metra EEO department.

- On eleven occasions starting in January, 1998 through January, 2000, Apelbaum's computer equipment was sabotaged, vandalized or destroyed. (Def. Ex. G at 6-7.)[2] Apelbaum claims his supervisors "knew" about these incidents although he does not indicate that he complained to them or anyone else at Metra. (*Id.*)

- Apelbaum believed that a co-worker screamed "white nigger" at him in a parking lot. (Def. L.R. 56.1 ¶ 99.) Apelbaum does not recall when this happened but responds to interrogatories that it occurred in 1998. (Apelbaum Dep. at 362-63; 372-73; Def. Ex. G at 5.) Apelbaum believes he spoke with his Metra supervisor Gerald Hoff ("Hoff") about the incident and that it was very clear that Hoff would handle any problems inside the department. (Apelbaum Dep. at 362-63; 372-73.) Apelbaum,

---

[2]The incidents are as follows:

| January 6, 1998 | Work computer sabotaged - would not boot |
| March, 1998 | Source code and applications deleted from computer and back-up on server |
| June 22, 1998 | Password deactivated - could not log in |
| August 21, 1998 | Source code for date and time calculator deleted |
| December 22, 1998 | Hard drives formatted |
| June 10, 1999 | "Expenditure Analyzer" (which apparently is a computer program used by Apelbaum) attacked and rendered useless |
| August 2, 1999 | Expenditure Analyzer again attacked |
| September 7, 1999 | "Oracle" (which apparently is a computer program used by Apelbaum) application disabled |
| September 17, 1999 | Two hard drives, backup drives with tapes, source code for several software applications stolen |
| November 9, 1999 | Modem connection terminated by Rhoades |
| January, 2000 | Telephone line and voice mail cut off by Robert Proper ("Proper"), a communications engineer for Metra |

(Def. Ex. G at 6-7.)

however, claims in his response to interrogatories that his supervisors and Countess Cary ("Cary"), the Director of Metra's EEO department, knew about this incident although he does not indicate when they learned about it. (Def. Ex. G at 5.)

- A co-worker called Apelbaum "unibomber" but Apelbaum does not remember when this occurred although he responds to his interrogatories that it occurred in 1998. (Def. L.R. 56.1 ¶ 100; Def. Ex. G at 5.) Apelbaum is unsure whether the co-worker called him that name or that she was saying the IS Department employees referred to him by that name. (Apelbaum Dep. at 350-53.) Apelbaum claims that his supervisors and Cary knew about this incident although he does not indicate when they learned about it. (Def. Ex. G at 5.)

- Metra Police Chief Leonard used the term "fucking Jew" when referring to the voice mail. (Leonard Dep. at 176, 204.) Leonard apparently used this term to explain what people are called by their ethnicity. (Def. L.R. 56.1 ¶ 101; Apelbaum Dep. at 390-92.) According to Apelbaum, Leonard also used the term "dumb Poles." (Apelbaum Aff. ¶ 88.) Further, in the same conversation, Leonard used the example that he was of German descent and, therefore, he had previously been referred to as "kraut." (Leonard Dep. at 176.) This incident occurred on November 8, 1999. (Def. Ex. G at 5.) Apelbaum claims that Cary knew about this incident but does not indicate when she learned about it. (*Id.*)

- Rhoades and Hoff called Apelbaum a doofus and idiot. (Def. L.R. 56.1 ¶ 102; Apelbaum Dep. at 253, 346, 391.) In his response to interrogatories, Apelbaum provides only one instance where he was called an idiot, which was on August 20, 1999. (Def. Ex. G at 5.) He testified at his deposition that Hoff called him an idiot several times and Rhoades called him a doofus, although he cannot remember when. (Apelbaum Dep. at 253-54.) Apelbaum claims that Groner knew about the "idiot" incident although he does not indicate when he learned about it. (*Id.*)

- Some unknown person urinated on Apelbaum's books, which Apelbaum testifies occurred near the end of his employment. (Apelbaum Dep. at 526-29.) Apelbaum now attests the incident occurred in December 1999, although his response to interrogatories states it occurred during the week of January 10, 2000. (*Compare* Apelbaum Aff. 90 *with* Def. Ex. G at 5.) Apelbaum may have informed Rhoades and Groner of this incident. (Apelbaum Dep. at 528.)

- On January 13, 2000, Apelbaum was outside of the office of the associate

deputy director, Richard Tidwell ("Tidwell") and believed Hoff, Rhoades' supervisor, was in there. Apelbaum overheard the term "kike" being used and attributed it to either Tidwell or Hoff. (Apelbaum Dep. at 228-32, 642.)

At all relevant times, Metra had an Equal Employment Policy that stated Metra would not discriminate on the basis of, among other characteristics, religion and national origin and that its policy "affects decisions including but, not limited to, an employee's . . . terms and conditions of employment, . . . and other privileges of employment" and that it would comply with local, state and federal law. (Def. Ex. D.) Although Apelbaum does not dispute that Metra had such a policy, he attests that he did not receive a copy of the policy. (Pl. Resp. to Def. L.R. 56.1 ¶ 9, citing Apelbaum Aff. ¶ 27.) Further, around or about 1997, Apelbaum attended a diversity awareness training class that involved discussions regarding "various avenues and scenarios to address diversity in the workplace." (Apelbaum Dep. at 362-63.) Despite acknowledging that he attended the class, Apelbaum denied that he was aware of a Metra anti-discrimination policy and believed that Metra tolerated discrimination because employees used derogatory comments when describing other employees of a different race or national origin. (Apelbaum Dep. at 362-64.)

**B.    Metra's response to Apelbaum's complaints**

As earlier stated, in response to Apelbaum's internal EEO complaint, Metra police initiated an investigation. (Pl. Ex. 118.) As part of this investigation, Metra police uncovered what it believed was misconduct on Apelbaum's part, including that Apelbaum had improperly downloaded a software program to crack Metra's network system. (*Id.*)

On December 8 and 9, 1999, Metra police questioned Apelbaum for seven hours. Neither counsel for Apelbaum nor for Metra was present. (Def. L.R. 56.1 ¶ 105; Pl. Resp. to Def. L.R.

56.1 ¶ 105.) The questioning involved matters such as (a) details regarding the confiscated software, hardware and other computer equipment that Apelbaum claimed belonged to him; (b) Apelbaum's method used to log on to the server as an administrator and to corrupt the financial data; (c) Apelbaum's reports of the vandalism to his computer equipment; (d) projects and programs that Apelbaum worked on for Metra; (e) Autodesk 3D Studio Max software and its registration to Apelbaum's private company;[3] (f) the Construction Manager project; (g) Apelbaum's issues with not being allowed to take training classes; (h) irregularities noticed by Apelbaum in the Grant Department's financial reports;[4] and (i) the voice mail left on Apelbaum's work phone. (Def. L.R. 56.1 ¶ 105; Pl. Resp. to Def. L.R. 56.1 ¶ 105.)

On or about January 12, 2000, Hoff addressed a memorandum to Apelbaum, which notified Apelbaum that his employment was suspended with pay pending an investigation to be conducted in a Fact Finding Review ("FFR") scheduled for Thursday, January 20, 2000. (Apelbaum Dep. Ex. B, Bates Number 000071.) The following day, Metra sent Apelbaum a letter notifying Apelbaum that the FFR was for the purpose of assessing whether he violated Metra's Employee Handbook for Non-Contract Employees, Rules of Conduct section. (Def. L.R. 56.1 ¶ 108, Apelbaum Dep. Ex., Bates Number 000072.) In this letter, Metra stated that it discovered Apelbaum's violations as part of its police investigation that arose from Apelbaum's

---

[3]Metra claims it purchased Autodesk 3D Studio Max software at a cost of $3,509 and that Apelbaum improperly registered it to Bright Idea Software, his own company. (Def. L.R. 6.1 ¶¶ 53, 54.) Apelbaum disputes these facts by providing a copy of an invoice from Autodesk, Inc. with the words "Approved by Metra" stamped on it (Pl. Ex. 53) and a facsimile from Autodesk, Inc. stating that it does not have any serial numbers registered to Bright Ideas Software (Pl. Ex. 54).

[4]The Grant Department maintains the data for its financial reports in a computer database. (Def. L.R. 56.1 ¶¶ 56-57.) Apelbaum complained that the data was incorrect and now asserts that Metra also filed altered financial reports to state and federal agencies. (Pl. Resp. to Def. L.R. 56.1 ¶¶ 56-57.) Metra, however, asserts that it repeatedly audits its data. (Def. L.R. 56.1 ¶ 61.)

internal EEO complaint. (*Id.*) Even though Apelbaum denies receiving this letter, he was aware

of the FFR because he subsequently requested to have counsel present at the FFR. (Apelbaum

Dep. Ex., Bates Number 000074.)

On January 20 and 21, 2000, Metra held the FFR. (Def. L.R. 56.1 ¶ 110.) Apelbaum,

however, did not participate because he was "[a]dvised by an attorney not to attend it." (Def.

L.R. 56.1 ¶ 115; Apelbaum Dep. at 247.) The purpose of the FFR was to develop the facts in

connection with alleged misconduct by Apelbaum. (Def. L.R. 56.1 ¶ 114.) Sharon Austin

("Austin"), Metra's Chief Communications Officer, presided. (Def. L.R. 56.1 ¶ 113.) At the

conclusion of the FFR, Austin found the charges substantiated and supported Hoff's

recommendations for the termination of Apelbaum based on the following:

    a.    Apelbaum was dishonest in his report of the date relating to the receipt of the voice mail message.

    b.    Apelbaum failed to exercise good judgment and demonstrate high standards of conduct when he, without authorization, executed a hacking program from his computer.

    c.    Apelbaum was on the Internet without having a job related reason for doing so.

    d.    Apelbaum registered the software valued at over $3,000.00 to indicate that it was owned by his personal company, not Metra.

(Def. L.R. 56.1 ¶ 117.) Apelbaum now disputes the FFR's findings as unsubstantiated.

(Pl. Resp. to Def. L.R. 56.1 ¶ 117.)

In the normal course of business, recommendations for the termination of a non-contract

employee such as Apelbaum are subject to approval by the Executive Director of Metra, Philip

Pagano ("Pagano"). Apelbaum, however, asserts that Tidwell and Hoff made the decision to

10

terminate him. (Pl. Exs. 117-18.) On or about February 10, 2000, Hoff sent Apelbaum a letter that advised Apelbaum of the FFR's conclusions and that his employment relationship was terminated effective that date. (Pl. Ex. 117.)

## C.    Apelbaum's charge and subsequent lawsuit

On November 15, 1999, Apelbaum filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that Metra employees discriminated against and harassed him between September 17 through November 9, 1999 because he was "verbally threatened and subjected to racial slurs," his work was "sabotaged," and his computer equipment was "vandalized[.]" (Def. Ex. F.) Further, Apelbaum alleged that he was retaliated against after filing an internal EEO complaint on October 18, 1999 because Metra cancelled his computer projects and removed his computer equipment. (*Id.*) On or about September 18, 2000, the EEOC sent Apelbaum a Notice of Right to Sue letter. (Def. Ex. N., Sec. Am. Compl. Ex. A.) Apelbaum filed the instant lawsuit against Metra on or about December 14, 2000.

## DISCUSSION

Metra argues that Apelbaum's Title VII claims are barred because Apelbaum failed to allege specific facts in his EEOC charge and because the discriminatory acts are barred by the statute of limitations. Additionally, Metra argues that Apelbaum cannot show national origin or religious discrimination (Counts I and II) under either the direct or indirect method of proof. Metra also argues that Apelbaum's retaliation claim under Count III fails because Apelbaum cannot show a causal link between his complaint to Metra's EEO Department and his

termination.[5]  Further, Metra argues that Apelbaum cannot identify an act by a decision-maker to support a civil rights violation under Count IV.  Moreover, Metra argues that Apelbaum cannot establish his claim for conversion under Count VII and further cannot establish damages because he has not proved the value of property allegedly converted or destroyed with any reasonable certainty.  Finally, Metra argues that if the court decides summary judgment in its favor on the federal claims, then the court should dismiss the remaining state law claims for lack of supplemental jurisdiction.

## A.     Counts I, II, and III: compliance with EEOC administrative procedures

Metra initially argues that Apelbaum's Title VII claims, which are Counts I, II, and III, fail because few of the discriminatory events alleged in the Second Amended Complaint were included in the EEOC charge and because most of the alleged events occurred more than 300 days prior to the date Apelbaum filed his EEOC charge.  Metra further argues that Apelbaum cannot pull the voice mail incident under the hostile work environment umbrella because Apelbaum testified that he believed the voice mail to be harassing conduct at the time he heard it and he has no justification for his over one-year delay in filing his EEOC charge based on this conduct.  (Def. Reply at 9-10.)  Plaintiff responds that the events alleged in the Second Amended Complaint are not barred because they are "clearly related to the allegations contained in" the EEOC charge.  (Pl. Resp. at 4.)

A Title VII complainant in Illinois "must file a charge of discrimination with the EEOC or equivalent state agency within 300 days after the 'alleged unlawful employment practice.'"

---

[5]Metra asserts its argument against Apelbaum's state law retaliatory discharge claims under Counts V and VI, but it is clear that both parties are debating the merits of Apelbaum's federal retaliation claim under Count III.

*Sharp* v. *United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001), quoting 42 U.S.C. § 2000e-5(e)(1). In general, this means that any discriminatory act that occurred more than 300 days before the charge was filed (here, before January 19, 1999) is not grounds for liability.

1.     *The hostile work environment claim*

Regarding pre-January 19, 1999 acts, Apelbaum relies on *National R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, ___, 122 S. Ct. 2061, 2075 (2002), for his position that these acts are actionable because they were "part of one unlawful employment practice." (Pl. Resp. at 3.) In *Morgan*, the Court reiterated that a plaintiff cannot recover for discrete discriminatory acts[6] (as contrasted to hostile work environment claims) that are time-barred even when they are related to acts alleged in timely filed charges. 122 S. Ct. at 2071-72. At the same time, the Court recognized that a hostile work environment claim is based not on a single act of harassment but on "the cumulative effect of individual acts." *Id.* at 2074. As such, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. * * * In order for the charge to be timely, the employee need only file a charge within . . . 300 days of any act that is part of the hostile work environment." *Id.* at 2074-75.

Metra relies in part on the pre-*Morgan* case, *Hall* v. *Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002), as well as the post-*Morgan* case, *Miller* v. *New Hampshire Dept. of Corrections*, 296 F.3d 18, 22 (1st Cir. 2002). Although *Hall* supports Metra, its continued vitality after *Morgan* is questionable. In *Miller*, the court referred to footnote 7 in *Morgan* and determined

_____

[6]In defining what constituted a "discrete" act, the Court in *Morgan*, identified "termination, failure to promote, denial of transfer, or refusal to hire[.]"  122 S. Ct at 2073.

13

that *Morgan* left open the issue of claim accrual[7] and concluded that the plaintiff's retaliation claim was time-barred because the various retaliatory acts were discrete acts on which the plaintiff should have acted promptly. Thus, neither *Miller* nor the discussion at *Morgan* footnote 7 addresses a hostile work environment claim. Under *Morgan*, because Apelbaum's charge contained hostile acts within 300 days preceding the filing of the charge, acts of a similar type that occurred previously may be considered for purposes of liability.

Using another tack, Metra argues that those allegations of the Second Amended Complaint that are not comprehended by the EEOC charge (which addressed threats, racial slurs, and computer sabotage occurring between September 17 and November 19, 1999) must be disregarded, pointing out that Apelbaum never filed another EEOC charge or amended his charge to incorporate other acts. (Def. Reply at 9.) In general, the complaint must rest on the facts presented in the charge, but "plaintiffs [may] proceed on claims not explicitly set forth in a charge of discrimination if the claim is like or reasonably related to the EEOC charge, and the claim in the complaint "reasonably could be expected to grow out of an EEOC investigation of the charge." *Peters* v. *Renaissance Hotel Operating Co.*, 307 F.3d 535, 550 (7th Cir. 2002); *see Cheek* v. *W. & S. Life Ins. Co.*, 31 F.3d 497, 500-01 (7th Cir. 1994) (internal quotations omitted). "'This means that the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the *same individuals*.'" *Haugerud* v. *Amery Sch. Dist.*, 259 F.3d 678, 689 (7th Cir. 2001), quoting *Cheek*, 31 F.3d at 501 (emphasis in original). The purpose behind this

---

[7]In footnote 7 of *Morgan*, the Supreme Court acknowledged that in some circumstances it may be difficult to determine when the time period should begin to run from a discrete act: when it happened or when the plaintiff should have discovered it. 122 S. Ct. at 2073; *but see Sharp*, 236 F.3d at 372 ("The 300-day limit . . . begins to run when the defendant has taken the action that injures the plaintiff and when the plaintiff knows she has been injured, not when [she] determines that the injury was unlawful[.]" (internal citations and quotations omitted)).

rule is to permit the EEOC to investigate these claims before the plaintiff files suit and to give the employer some warning of the unlawful conduct. *Cheek*, 31 F.3d at 500. Because the voice mail and alleged attacks on Apelbaum's computer equipment were events that occurred before he filed his EEOC charge and he alleged in his charge and his Second Amended Complaint that all the conduct is related to the same alleged pattern of harassment, the court concludes that all such acts are reasonably related to the underlying charge and may be expected to grow out of investigation of his charge. And although it cannot say that the same individuals were implicated because, in the main, they have not been identified, for purposes of summary judgment, the court will consider the evidence.[8]

## B.     Counts I, II, and III: merits of the Title VII claims

*1.     The hostile work environment claim*

Title VII prohibits an employer from "requiring people to work in a discriminatory hostile or abusive environment." *Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Apelbaum relies on his testimony regarding derogatory names, including the offensive voice mail, Rhoades' confiscation of his computer equipment, the vandalism, Metra's falsely accusing him of registering software purchased by Metra to his own company, and the police interrogation of him

---

[8]Metra's argument in reply that Apelbaum failed to amend his charge to incorporate acts that occurred after he originally filed is both untimely and without merit. *See James* v. *Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998) ("Arguments raised for the first time in a reply brief are waived."). In addition, the Seventh Circuit has ruled that "a plaintiff need not bring a separate EEOC charge in making a claim for retaliation." *Aviles* v. *Cornell Forge Co.*, 183 F.3d 598, 606 (7th Cir. 1999), citing *Malhotra* v. *Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir. 1989). With respect to the discrimination claims, there is similar authority that post-charge events may be considered. *Cf. Witherspoon* v. *Roadway Express, Inc.*, 782 F. Supp. 567 (D. Kan. 1992) (discriminatory termination claim which arose during pendency of administrative investigation of discriminatory promotion claim was not barred by failure to exhaust administrative remedies); *see also Harper* v. *Godfrey Co.*, 45 F.3d 143, 148 (7th Cir. 1995) (discussing *Witherspoon* but determining that the plaintiff must still allege same conduct and individuals in underlying EEOC charge.).

without assistance of counsel.

Even if it is assumed that Apelbaum's facts are true, Apelbaum must still show that the conduct occurred because of his religion (for convenience hereafter, the allegations of discrimination based on national origin will be included under the term "religion"), and that his work environment was both subjectively and objectively hostile. *Adusumilli* v. *City of Chicago*, 164 F.3d 353, 360 (7th Cir. 1998). Apelbaum's evidence of his subjective feelings at the time satisfy the "subjectively hostile" prong of proof. Concerning the "objectively hostile" prong, the Seventh Circuit has stated,

> An objectively hostile environment is one that a reasonable person would find hostile or abusive. . . . In determining whether a plaintiff has met this standard, courts must consider all the circumstances, including the frequency of the discriminatory conduct, its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Id.* (internal citations and quotations omitted.).

With respect to the derogatory names, Apelbaum identifies derogatory names from 1996 (if Metra is believed as to the date of the voice mail) through 1998, or all in 1998 (if Apelbaum is believed about the voice mail).[9] These remarks were directed at him, as he must show. *See*

---

[9]The chronology is as follows:

| Date | Language Used | Speaker | Circumstances |
| --- | --- | --- | --- |
| unidentified | Yassir, Fidel, Moamar Sadam | unknown | directed at Apelbaum |
| September, 1996 or November, 1998 | Hey you fuckin' Jew, do you want to die? | unknown (voice mail) | directed at Apelbaum |
| sometime in 1998 | white nigger | co-worker | directed at Apelbaum |
| sometime in 1998 | unibomber | co-worker | directed at Apelbaum |

*Gleason* v. *Mesirow Fin., Inc.*, 118 F.3d 1134, 1144-46 (7th Cir. 1997) (holding, *inter alia*, no

hostile work environment where the supervisor's sexual comments were directed at others rather

than the plaintiff); *Ngeunjuntr* v. *Metro., Life Inso. Co.*, 146 F.3d 464, 467 (7th Cir. 1998) ("The

alleged comments [about the yellow race, Buddhists, or Middle Eastern people] were offensive

but they were also isolated and, in some circumstances, not directed at [the plaintiff]."). All but

one of the subsequent comments, however, do not evidence harassment in that Apelbaum has not

shown that two of them (kike, fucking Jew) were directed at him or that the third (idiot/doofus)

was based on Apelbaum's religion.[10] *See supra*. The urination incident, viewed as a form of

speech, was directed at Apelbaum by an unknown person. Even if it is assumed that a jury might

find it an anti-Jewish expression, it remains as the only incident directed at him after 1998. In

short, the only reasonable inference from the evidence taken as the whole--at most six or seven

incidents directed at Apelbaum over the course of more than three years, and nothing after 1998

that was expressly religiously derogatory--is that they were not of such frequency or severity as to

interfere with Apelbaum's employment. *See Peters*, 307 F.3d at 555 (holding no hostile work

environment claim where the plaintiff was subjected to six incidents of offensive conduct in a

| August, 1999 | idiot/doofus | Rhoades/Hoff | directed at Apelbaum |
|---|---|---|---|
| November 8, 1999 | fucking Jew | Police Chief Leonard | not directed at Apelbaum |
| December, 1999 or January, 2000 | urination on books | unknown | directed at Apelbaum |
| January, 2000 | kike | Tidwell or Hoff | not directed at Apelbaum |

[10]There is no evidence that Apelbaum was called a "doofus" or "idiot" in relation to his religion or national origin. *Cf. Carr* v. *Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir. 1994) (the plaintiff has to show that, "because of her sex," she was subjected to such hostile, intimidating, or degrading behavior, verbal or nonverbal, as to affect adversely the conditions under which she worked; for Title VII is not directed against unpleasantness *per se* but only, so far as relates to this case, against discrimination in the conditions of employment).

one-and-a-half-year period, including the supervisor's asking a white employee and not the plaintiff to carry money, the human resources director's not saying "hello" and diversity training revealing racial strife). This is particularly so where Apelbaum did not even report the incidents until at best a year or more after they occurred.

The issue remains whether a reasonable jury, viewing the derogatory comments along with Apelbaum's allegations of repeated computer sabotage or vandalism, could infer discrimination based on religion. The evidence viewed in a light favorable to Apelbaum shows that he lodged a complaint with Metra in October, 1999 and Metra launched an investigation. Other than this he merely alleges 11 incidents of a"sabotage" on his computer over a two-year period. Although one might infer that such incidents would alter the conditions of one's employment, Apelbaum has no evidence that they were motivated by animosity to his religion, in that he has not identified the vandals with the exception of a Robert Proper, a communications engineer with Metra and Rhoades who is not linked to the derogatory names, or established Metra's failure to act on the matter. To infer an anti-Jewish motive would be wholly speculative.

Further, Apelbaum cannot show how Metra's conduct in launching a police investigation after Apelbaum filed his internal EEO complaint was harassment or retaliation. As the court stated in *Ribando* v. *United Airlines, Inc.,*"it seems that [the defendant] did what an employer should do when an employee lodges a complaint of sexual harassment against another: it investigated, documented and counseled." 200 F.3d 507, 511 (7th Cir. 1999).

Even if, however, Apelbaum could show a hostile work environment, Metra's affirmative defense that Apelbaum either did not complain of the harassment or that Metra took corrective action when it received Apelbaum's complaints (Def. Reply at 11; Def. Third and Fifth

Affirmative Defenses) would prevail as a matter of law. *See Parkins* v. *Civil Constr. of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998) ("employers are liable for a co-employee's harassment only when they have been negligent either in discovering or remedying the harassment. . . . An employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of [religious] harassment of its employees." (internal citations and quotations omitted)).[11] Here, it is undisputed that Metra had an Equal Employment policy. Although Apelbaum attests that he did not receive this policy, he knew to report harassment to his supervisors and/or Metra's EEO department as demonstrated by his filing an internal EEO complaint. *See Hill* v. *Am. Gen. Fin., Inc.*, 218 F.3d 639, 644 (7th Cir. 2000) (determining that the plaintiff did not recall having received copies of the policies but her deposition testimony showed that she knew how to use the complaint procedures). Further, although Apelbaum testified that his supervisors failed to act on his complaints, Apelbaum reported in his internal EEO complaint only the sabotage and vandalism of his computer equipment and the voice mail. *Accord, Parkins*, 163 F.3d at 1037 (stating "[the plaintiff] provides no support for her argument that an employer's designation of one avenue for complaints in its sexual harassment policy

---

[11]*Parkins* distinguishes an employer's liability based on supervisor versus co-worker harassment. 163 F.3d at 1032-33. If the harassers were Apelbaum's supervisors, then Metra is strictly liable, but if the harassers were merely co-employees, then Metra is liable only if it was negligent either in discovering or remedying the harassment. *Id.* Here, although Apelbaum testifies that he was harassed by his supervisors, the evidence shows that if Apelbaum was harassed, he was harassed by his co-workers.

Moreover, even if Apelbaum was harassed by his supervisors, he does not argue nor show that the harassment resulted in a tangible employment action and, therefore, Metra may assert the well-established *Ellerth/Faragher* defense. *Burlington Indus.* v. *Ellerth*, 524 U.S. 742 (1998); *Faragher* v. *City of Boca Raton*, 524 U.S. 775 (1998). This defense provides that (1) Metra exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) that Apelbaum failed to take advantage of any preventive or corrective opportunities provided by Metra to avoid harm. *Wolf* v. *Northwest Indiana Symphony Soc'y*, 250 F.3d 1136, 1142 (7th Cir. 2001). For the same reasons discussed above, Metra is entitled to summary judgment according to the *Ellerth/Faragher* defense as well.

19

forecloses the possibility of making complaints elsewhere. *Cf. Young* [v. *Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997)] (noting that the employer had four authorized channels for lodging complaints)."). Metra investigated the complaint. At no point did Apelbaum report the other acts that he believed constituted harassment, even though he acknowledged that he had attended diversity awareness training in 1997.[12]

For these reasons, Metra is entitled to summary judgment on Apelbaum's hostile work environment claims under Counts I and II.

## 2. *Counts I and II: the discrimination/disparate treatment claims*

Under Title VII, an employer cannot "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-2(a)(1). In order to prevail on his claim of discrimination, Apelbaum must establish that his termination would not have occurred but for Metra's motive to discriminate against him because of his religion. *See Pafford* v. *Herman,* 148 F.3d 658, 669 (7th Cir. 1998). Apelbaum may meet his burden of proof either through offering direct proof of discriminatory intent or by proving disparate treatment through the indirect, burden-shifting method outlined in *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792 (1973).

### a. *direct method of proof*

"Under the direct proof method, plaintiff must show either an acknowledgment of discriminatory intent by the defendant or its agents, or circumstantial evidence that provides the

---

[12]Although Apelbaum claims Cary knew of some of the other acts of harassment such as the "white nigger" and "unibomber" remarks in his response to Metra's interrogatories (Def. Ex. G at 5), *see* discussion *supra* pages 6-7, Apelbaum does not show that he complained of such acts to Cary or when she became aware of these acts.

basis for an inference of intentional discrimination." *Contreras* v. *Suncast Corp.*, 237 F.3d 756, 759 (7th Cir. 2001), citing *Troupe* v. *May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Apelbaum may demonstrate his case with evidence which, if believed by a trier of fact, will prove the particular fact in question without reliance upon inference or presumption. *Eiland* v. *Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998), quoting *Plair* v. *E.J. Branch & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997). Further, a proffer of direct evidence must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question. *Plair,* 105 F.3d at 347.

Apelbaum initially argues that he has direct proof of discrimination based on the various derogatory comments such as the utterance of the word "kike" by Tidwell and Hoff and based on Metra's confiscation of his computer equipment and Metra's harassment. (Pl. Resp. at 6.) There is no evidence, however, that any of these acts were related to the specific employment decision in question, *i.e.*, his termination. *See Mateu-Anderegg* v. *Sch. Dist. of Whitefish Bay*, 304 F.3d 618, 624-25 (7th Cir. 2002) (determining statements must be made "(1) around the time of, and (2) in reference to, the adverse employment action complained of." (internal citations omitted)); *Venters* v. *City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997) ("Evidence of discriminatory motives must . . . have some relationship with the employment decision in question; inappropriate but isolated comments that amount to no more than 'stray remarks' in the workplace will not do."). Thus, Apelbaum has not demonstrated direct proof of discrimination.

*b.*     *indirect method of proof*

Under the *McDonnell Douglas* burden-shifting method, Apelbaum must raise an inference of discrimination by offering sufficient evidence to make out a *prima facie* case.

*Contreras*, 237 F.3d at 759. Apelbaum must demonstrate that (1) he belongs to a protected class; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) Metra treated similarly situated employees outside of his protected class more favorably. *Id.* If Apelbaum can make a *prima facie* showing, then a presumption arises that Apelbaum was discriminated against, and Metra must come forward with a legitimate nondiscriminatory reason for the employment action. *Id.* at 760. At this stage, Metra need not prove that it was actually motivated by the proffered reason. Rather, Metra "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.*, quoting *Texas Dep't of Community Affairs* v. *Burdine*, 450 U.S. 248, 257 (1981). Once Metra has met this burden of production, Apelbaum must prove by a preponderance of the evidence that the reason offered by Metra is merely a pretext for discrimination. *Contreras*, 237 F.3d at 760. "This court [then] looks to determine if a factual dispute exists as to whether the employer's reasons for its decision are honest and genuinely motivated." *Plair*, 105 F.3d at 348, citing *Sirvidas* v. *Commonwealth Edison Co.*, 60 F.3d 375, 378 (7th Cir. 1995). Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that Metra intentionally discriminated against Apelbaum remains at all times with Apelbaum. *Sirvidas*, 60 F.3d at 378.

Apelbaum is unable to make a *prima facie* showing of discrimination. Apelbaum may establish that he was in a protected class because he is Jewish and that he suffered an adverse employment action because of his termination. Although Apelbaum provides evidence that he received good performance reviews (Pl. Resp. at 7-8), he does not show that at the time of his termination he was meeting Metra's legitimate expectations. *See Peters*, 307 F.3d at 545-46

22

("[T]he question is not whether at any time in [the plaintiff's] employment he was meeting his employer's expectations; the question is whether he was meeting his employer's expectations at the time he was terminated."). Further, Apelbaum has no evidence that anyone outside of his protected class was treated more favorably in similar circumstances, for example, where Metra believed an employee had engaged in misconduct. Indeed, Apelbaum does not address this factor in his response brief but rather asserts in his response to Metra's statement of facts that Metra fails to provide "any documentation regarding the investigation of employees similarly situated." (Pl. Resp. to Def. L.R. 56.1 ¶ 107; Pl. Resp. at 8.) Apelbaum cannot shift this evidentiary burden to Metra at this stage. As stated above, the plaintiff has the burden to make the *prima facie* showing. Because Apelbaum has failed to do so, it is unnecessary to reach the issue of pretext. Therefore, the court will grant summary judgment in favor of Metra on Apelbaum's discrimination claims under Counts I and II.

### 3. *Count III: the retaliation claim*

In his Second Amended Complaint, Apelbaum alleges that Metra retaliated against him "for reporting and objecting to religious and national origin discrimination." (Def. Ex. N, Sec. Am. Compl. ¶ 30.) However, Apelbaum argues in his response brief to Metra's summary judgment motion that he was retaliated against because he refused to alter financial data for Rhoades, and that Metra falsely accused him of downloading computer cracking software and falsely stated that it owned Apelbaum's computer equipment. (Pl. Resp. at 12-13.) Further, Apelbaum points out that he was subjected to a seven-hour police interrogation and also argues that the proximity in time of the urination incident bolsters his view that Metra was retaliating against him. (Pl. Resp. at 12-13.) Metra, however, argues that Apelbaum cannot show that

Metra retaliated against him.

To establish a *prima facie* case of retaliation, Apelbaum must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Parkins*, 163 F.3d at 1038-39, citing *Debs* v. *Northeastern Ill. Univ.*, 153 F.3d 390, 397 (7th Cir. 1998). If he establishes these elements, Metra has the burden to produce a legitimate, nondiscriminatory reason for its actions. Once this reason is produced, Apelbaum must prove that the reason is pretextual. *Parkins*, 163 F.3d at 1039.

Based on Apelbaum's response brief, Apelbaum's own arguments belie a claim of retaliation under Title VII because he does not argue that the reason was his having engaged in protected activity but rather because he refused to alter financial data. Although the argument suggests a common law claim for wrongful discharge, it is not a Title VII claim. *See Houghtby* v. *Box*, No. 01 C 50401, 2002 WL 992655, at *1 (N.D. Ill. May 14, 2002) ("Under Illinois law, wrongful discharge must involve either employees with contract terms which make their employment other than at-will, *e.g. Doyle* v. *Holy Cross Hospital*, 289 Ill. App. 3d 75, 224, . . . 682 N.E. 2d 68, 69 (1st Dist. 1997), . . . or employees who have been discharged in violation of a clearly mandated public policy. *E.g. Jacobsen* v. *Knepper & Moga, P.C.*, 185 Ill. 2d 372, 235, . . . 706 N.E. 2d 491, 493 (Ill. 1998)."). Apart from this fatal flaw, even if the court relies directly on Apelbaum's Second Amended Complaint and the record before it, Apelbaum cannot make a *prima facie* showing of retaliation under Title VII. Although Apelbaum engaged in protected activity and was later fired, his proof fails to support a reasonable inference that the reason was retaliation for filing the internal EEO complaint or EEOC charge. The police investigation in

24

response to the internal EEO complaint, as indicated, was appropriate, not retaliatory. The investigation went down a path Apelbaum did not anticipate in that Metra concluded that Apelbaum had engaged in misconduct. Apelbaum did not appear at the FFR to present his side of the situation,[13] and Metra made a decision to fire him, Metra asserts, not because of his complaint but because of what it discovered in investigating the complaint. *Cf. Willis* v. *Marion County Auditor's Office*, 118 F.3d 542, 547-48 (7th Cir. 1997) (upholding lower court's grant of judgement as a matter of law in favor of the defendant on the plaintiff's retaliation claim because, *inter alia*, the plaintiff was afforded an opportunity to substantiate her claims that someone planted the invoices on her); *Conn* v. *Gatx Terminals Corp.*, 18 F.3d 417, 420 (7th Cir. 1994) (finding that a non-decision-maker's animus did not infect the decision-making process when the plaintiff was able to appear before the decision-maker and present his side of the story, and the plaintiff failed to impute an retaliatory animus of the supervisor to the decision-maker); *Long* v. *Eastfield College*, 88 F.3d 300, 307 (5th Cir. 1996) (stating that the decision-maker's independent investigation breaks the casual link between firings and subordinates' retaliatory intent). Simply put, the court finds no evidence beyond Apelbaum's personal opinion from which to draw an inference of a causal link. For these reasons, Apelbaum not only cannot make a casual link in his *prima facie* case, but could not demonstrate pretext. The court, therefore, will grant summary judgment in favor of Metra on Count III.

---

[13]Although Apelbaum complains that he was questioned without counsel and did not appear at the FFR on advice of counsel, he cites no authority for any right to counsel during the interrogation, any right to be excused from the FFR, or how such a right would pertain to his claims presented here.

## C.  Court IV: violation of equal protection rights pursuant to section 1983

To establish the § 1983 liability of a municipal corporation,[14] *respondent superior* cannot be the basis.  Instead, a municipal corporation be held liable under § 1983 in one of three ways:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Baxter* v. *Vigo County Sch. Corp.*, 26 F.3d 728, 724-35 (7th Cir. 1994).  The parties' dispute centers mainly on (3) because Metra argues that Apelbaum cannot identify an act by a decision-maker to support a civil rights violation under Count IV.  Determining who has final policymaking authority is a question of state or local law.  *Horowitz* v. *Bd. of Ed. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 619 (7th Cir. 2001).  Clearly, if Apelbaum can show he suffered a constitutional injury, then he can show that that injury was ratified by a person with final policymaking authority because Pagano, whom Metra admits had final policymaking authority, see 70 ILCS 3615/3B.05, approved of Apelbaum's termination.

Nevertheless, Apelbaum has no evidence to show that he has a section 1983 claim under Count IV.  Apelbaum alleges that Metra violated his equal protection rights based on Metra employees' religious discrimination against him and Metra's failure to protect him against this discrimination.  (Def. Ex. N, Sec. Am. Compl. ¶¶ 36-37.)  To establish a *prima facie* case under the Equal Protection Clause of the Fourteenth Amendment, Apelbaum must demonstrate that he "(1) is a member of a protected class; (2) is otherwise similarly situated to members of the

---

[14] As discussed, Metra is a public corporation created under the Regional Transportation Authority Act, 70 ILCS 36.15/1.01 *et seq.*, and it does not dispute that section 1983 applies to it.

unprotected class; (3) suffered an adverse employment action; (4) was treated differently from members of the unprotected class; and (5) the [municipality] acted with discriminatory intent." *McPhaul* v. *Bd. of Comm'rs of Madison County*, 226 F.3d 558, 564 (7th Cir. 2000); *Greer* v. *Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000). Apelbaum cannot show that he was similarly situated to members of the unprotected class under (2) or that Metra treated him differently from members of the unprotected class under (4). With respect to (5), Apelbaum must show that Metra "acted with a nefarious discriminatory purpose" because of his religion, *McPhaul*, 226 F.3d at 564, quoting *Nabozny* v. *Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996), which he is unable to do. Therefore, the court will grant summary judgment in favor of Metra on Count IV.

**D.     Counts V, VI, VII: the state law claims**

The only remaining claims are state law claims. The court declines to exercise supplemental jurisdiction over these claims. See 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court dismissed all claims over which it has original jurisdiction."); *Grace* v. *Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."). As such, the court will dismiss the state law claims without prejudice for lack of subject matter jurisdiction.

## CONCLUSION

For the reasons stated above, the court grants Metra's motion for summary judgment on

Counts I, II, III and IV [#60]. The court dismisses Counts V, VI and VII without prejudice to file

in state court.

ENTER: *Joan N. Lefkow*

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: January 16, 2003